## REMITTING PART OF A VERDICT AN INVASION OF THE RIGHT OF TRIAL BY JURY.

Court of Appeals for Cuyahoga County.

### THE CLEVELAND WORSTED MILLS COMPANY v. DANIEL C. COATES, GUARDIAN OF JOSEPH SCHEVERELL.

Decided, November 22, 1916.

*Employment of Children Under Statutory Age—Burden on Employer to Show Deception in Matter of Age—Verdict Induced by Passion or Prejudice—Should be Set Aside—Not Reduced in Amount—Reasonableness of Damages Awarded to Injured Boy—Tested by Probable Future Earning Power.*

1. Whether or not the employment of children of non-age has been innocent or with knowledge is a question for the jury, with the burden on the employer of showing affirmatively that he has been misled and deceived in the matter of age.

2. Where an excessive verdict has been returned through passion or prejudice, it is the right of the defendant to have it set aside, and the reduction of such a verdict, except where done by consent, to an amount determined by the independent judgment of the court, rather than that of a jury, is an invasion of the right of trial by jury.

3. A verdict of $25,900 for the loss of his right hand by a factory boy is so large as to justify the conclusion it was reached through passion or prejudice, and the action of the trial court in reducing the amount $10,000, instead of granting a new trial, constitutes error which requires a reversal of the judgment; and this result may be reached without weighing the evidence in detail, but from the verdict itself in its relation to the evidence as a totality, under the circumstances of the whole case.

*H. H. McKeehan* and *Price, Alburn, Crum & Alburn,* for plaintiff in error.

*Anderson & Lamb,* contra.

GRANT, J.

Error to the court of common pleas.

In the view we have taken of this case and of the question upon which our conclusion is made to turn, we have felt justified in

giving it an unusual consideration, at least in point of time, since it was argued at the bar, a result that has been aided by the wish of counsel to prepare an additional brief, which was late in coming in.

That conclusion has been at last reached not without a becoming diffidence on our own part, but such as it is it will have to stand as the judgment of the court.

The questions said to arise upon the record before us and entitled to consideration at our hands, as is claimed, have taken in the briefs submitted and in the arguments of counsel—a wide range. Our discussion of them will cover a much narrower one, and will follow no particular order, but we shall endeavor, nevertheless, to declare the law of the case as we are given to see it.

In this proceeding the parties stand in the opposite order of position to their standing in the court below, but to avoid confusion and for the sake of convenience they will be designated here as they were there.

The plaintiff's ward—being the real and beneficial plaintiff—was a boy when he sought and obtained employment in the factory of the defendant company. Just how old he then was is in dispute, or at least is uncertain. He was somewhere from fourteen to sixteen years of age; such are the utmost landmarks in point of certainty named in the brief of the defendant company.

When he solicited the employment he produced a certificate of the superintendent of schools of Ravenna, Ohio, the town where he worked, which purported to show that he was of such age that when he came to his injuries on the 11th day of April, 1915, he was sixteen years and three months old. As he was employed substantially a year and three months earlier than that, it would follow that his represented age when he took employment was fifteen or thereabout—about four days, less, to be exact in regard to it.

A proper consideration of the case has to do with certain statutes of Ohio, and the instruction of the trial court, given in charge to the jury, required the jurors to apply these to the facts as they should find them, and be guided to their verdict accordingly. These statutes are the following:

"Section 12993. No male child under fifteen years of age shall be employed, permitted or suffered to work in, about or in connection with any mill, factory, workshop," etc. 1913 Session Laws, p. 907.

"Section 12999. No child under the age of sixteen years shall be employed, permitted or suffered to work * * * in proximity to any hazardous or unguarded belts, machinery or gearing." 1913 Session Laws, p. 909.

"Section 13002. No child under the age of sixteen years shall be employed, permitted or suffered to work in any capacity * * * in any other occupation dangerous to the life and limb * * * of such child." 1913 Session Laws, p. 910.

"Section 1027. The owners and operators of shops and factories shall make suitable provisions to prevent injury to persons who use or come in contact with machinery therein, or any part thereof, as follows:

"2. They shall enclose in substantial railings or casing all exposed cog-wheels. * * *

"7. They shall guard all saws, wood cutting, wood shaping and all other dangerous machinery."

"Section 6245-2. In all such actions where a minor employee has been employed or retained in employment contrary to any statute or law of the state or the United States, such employee shall not be deemed or held to have been guilty of contributory negligence nor to have assumed any of the risk of such employment, but the employer may show by way of defense any fraud or misrepresentation made by such employee."

It will be observed that by the first of these enactments the inhibition of the employment of a male child in the interdicted occupations, if under the age of fifteen years, is absolute and complete and is not saved or affected by a school certificate; the two tests are age and the character of the employment.

By the second of them the employment of any child under the age of sixteen years in work which requires the operation of, or proximity to, the hazards of unprotected machinery, is denounced as unlawful; having a school certificate in no way exonerates from the operation of the positive prohibition.

By the next the maintenance of certain machinery regarded as dangerous is forbidden, unless it is provided with the named safeguards. The age of the persons sought to be protected by this provisions is not material. Section 1027, by its quoted

parts, supplements and re-enforces the inhibitions and muni-
ments of those which precede it, by enjoining on the employer
the observance of certain duties to that end.

Section 6245-2 is most important in the protection it under-
takes to provide for child labor. It guards against evasions
of the law in this respect by withholding from the transgress-
ing employer certain defenses which the common law gave him
—defenses easily made, often abused and commonly resorted to
to avoid a just responsibility, and hence of peculiar value to him.

But the employer's rights are cared for by allowing to him
the compensating advantage of protecting himself against being
overreached in the matter of taking into his service, unwittingly,
children under the prohibited age.

All this is a consistent and wisely provident scheme of legis-
lation, bottomed on the soundest and most wholesome public
policy. It is not to the honor or advantage of the state to have
a citizenship made up of cripples, and it is a huge economic loss
to have cast upon the public a growing inefficiency in the shape
of maimed inhabitants, more or less incapable of gainful effort
and likely to become at some age or time a public charge for
maintenance or repression. It is cheaper and better for the state
to have labor that is reasonably safeguarded against peril to
life and limb, than to make up the difference in the price of it
by paying pensions to laborers disabled in service, or to support
them in almshouses, or subject them to the indignity of being
compelled to eat the bitter bread of charity. A non-observance,
or an unfaithful obedience, of the duties placed as a fence by
law against the inroads of a conscienceless and unfeeling greed,
must result in a distinct loss of public manhood and an enormous
subtraction from the resources and earning power of our peo-
ple, and hence in a damaging blow to the commonwealth and
welfare.

The legal effect of these obviously and admittedly paternal
safeguards and repressions, is to introduce into the contracts
for labor to which they are a fortification, the state as a party,
to see that they are not disobeyed or evaded, and that they are
at all times kept up and enforced in all integrity. It is the duty,

as well as the right, of the state, even from a selfish and economic view, to thus care for its largest asset—human labor. "But if any provide not for his own, and especially for those of his own house, he hath denied the faith and is worse than an infidel," says the Scripture.

It follows that they can not be waived by the child, or his parent, or his guardian, and that the conduct of either in seeking or taking employment, can not estop the real and controlling party to the transaction, which, as we have already observed, is the public, acting and speaking through statute law.

This consideration is never to be lost sight of in dealing with the just administration of these enactments, operating beneficially to the public as well as the individual immediately concerned, by reasonable repression.

Nor is this view unjust to the employer. Putting behind him the later results, highly injurious to him, of being taxed to support an army of cripples or otherwise enforced idlers and incompetents, he seems to get by hiring children the advantage of labor that is, relative to what he must pay full hands, cheap. It is, moreover, a class of labor that is teachable, amenable to discipline, ineligible to unions and that can be brought to a considerable degree of efficiency before passing into a higher paid class.

Against a possible abuse of the opportunity for gain thus furnished, and the dangers lurking in the situation, the law has, wisely, as we think, put into it the sting of a disability, in the shape of denying to the employer his two most handy weapons of defense—that of assumed risk, and also of contributory negligence. It is not an unreasonable or improvident yielding that is thus required of him. And to the employed child it is probably a more dependable and less easily avoided measure of protection than are the positive prohibitions of the other sections of the statutes quoted.

But even here the Legislature has not left the employer wholly exposed to the fury of the proletariat. Remembering, doubtless that "God tempers the wind to the shorn lamb," it has provided an anchor for him to cast to windward, on occasion of

storm and stress in this regard, in the shape of allowing him to prove that in employing children of non-age he was himself the victim and not the delinquent—that he was deceived into the hiring. It is, we think, a full and fair compensation for the surrender he is required to make in respect of the denied defenses. Whether in the absence of this allowance he could make the defense, is something that need not be discussed; the defense is in our law distinctly permitted. The furnished weapon, however, is a shield and not a sword; it is a defense and not the letter of marque of an aggressor. So much has been said, rather discursively, perhaps, for the twofold purpose of developing the foundation view covering many, or most, of the vital questions in this case, and to obviate a more particular discussion of the authorities from other states which have been so luxuriantly and industriously brought to our attention in the briefs of counsel and the argument at the bar. In those states there seems to be an absence of the countervailing defense which our law gives to the employer. The allowance of it by statute appears not only to differentiate the cases cited from other jurisdictions, from the law applicable to this case, but to furnish the key to the solution we are called upon to make in the matter. To our apprehension all the other questions argued become, in this view of the case, relatively immaterial. The forbidden thing to the employer is the hiring of children of non-age. The law says "Thou shalt not"—guard or no guard, railing or no railing. If, nevertheless, he *does* hire, he exposes himself to all legal rigors.

But if he hires innocently, is defrauded into the hiring, he may by statute show the fact and go acquit of the consequences otherwise flowing from the forbidden thing.

But, as we have said, he may use the right defensibly only; he must "*show*" it. This means, we take it, that the burden is cast upon him of affirmatively satisfying a jury that he was really and in fact overreached and defrauded in employing the boy. In the case at bar this issue was submitted to the jury and the verdict finds that the defendant has not sustained the burden. If the question was properly submitted, the finding is

conclusive on us in this respect, there being evidence enough in the record, in our estimation, the tendency of which is to support the verdict returned—the end towards which the tendency points being for the jury and not for a court of review.

The evidence in the case was voluminous. It covered all controverted points and searched every question to which it could be addressed. It related to matters of fact—pre-eminently so. It was in fierce dispute throughout. It was peculiarly the function and duty of a jury to sift it, weigh it, accept it, reject it. We can not interfere to mould the evidence to a different conclusion than the jury reached, except upon considerations as to weight, which in this case we do not feel justified in taking upon ourselves.

The defense which the statute gives to the employer was not made out—so the verdict says, and we are not disposed to dispute it.

The evidence in other respects, if properly received, has a tendency—within the right of the jury to find—to fasten upon the defendant a liability to the plaintiff on account of his injuries brought about by what the verdict says was the culpable negligence of an employer of child-labor. The result, thus arrived at, must stand, unless for other errors to be found in the record it ought not to stand.

The other assigned errors must be dealt with more summarily, in view of the rather extensive development we have felt warranted in making to lay out the groundwork of our conclusion.

We fail to discover, upon the whole, any material or injurious mistake in the admission or exclusion of testimony upon the trial. That isolated and unrelated errors in this respect could be microscopically discoverable in a trial of this kind and length, is inevitable, of course; the wonder here is that they are so few. We find—all things considered—a clean bill of health in this regard.

We now come upon the question of the charged misconduct of counsel. It is an old and familiar acquaintance. It is a subject more fruitful of homilies as to doctrine and reproof, and more infertile in results, than any other that we know of.

That the conduct complained of was highly improper, is very likely; indeed, we have no difficulty at all in finding it so from this record.

That it was so exceptionally and enormously flagitious, in quality or in output, as in its totality to have acted on the jury injuriously to the defeated party, or that the court refused to act, or failed to act, at any point where it was called upon to act, or where it became its duty to act without call, in assertion of its own dignity or observance of the rules of common decency, we are not prepared to say.

The record presents the ordinary dismal scene of unseemly strife over the table, between—or perhaps by—members of a highly ethical calling—so ethical that, as they admit the fact, it need not be proved. They are the descendants of those who in ancient Rome were the "*clarissimi*" of the state, and whose opinions upon questions of law and public moment were the "*Responsa Prudentum*"—the answers of the wise. Here, they were not indeed the "senior wranglers" of the English universities, but just plain, ordinary wranglers. As usual, crimination no doubt begat recrimination, for the whole record in this respect is not before us, and the jury looked on, very likely, amused but not especially swayed in outcome by the performance. It is related that an Irish barrister, on the trial of a cause, picked up a chair and started for his adversary on the other side of the table, crying out furiously, "I'll teach you to be a gentleman, sir!" To which the other roared in equal fury, "I defy you to do it, sir!"

Besides, the infirmity—if it was such—may have been cured, or excused, perhaps, by what counsel may have regarded as a sort of "healing act," when he said (Record, p. 399), "By the way, this is my birthday. I am fifty-one years of age today." The imputed misconduct may have been only the usufruct of a proper celebration of the highly desirable, or at least notable, event thus called to the jury's mind.

Moreover, since action and reaction balance each other to a stable equilibrium, a dead standstill, it frequently, or, generally,

it may safely be said, comes to pass that the misconduct engendered by zeal at a trial over-does itself, and so corrects itself, in the eyes of a jury. Like the recoil of an overloaded musket, it kicks the firer over. A jury, commonly, observation and some bitter experience has taught us, regards the Punch and Judy, or Pickwickian fights of lawyers much as they should look upon the gambols of a hippopotamus or the pleasantries of a Scotchman—as interesting but not especially convincing. However reprehensible the conduct or motive of counsel may have been in applying himself to the jury—and we are not saying that it was so—we give charitable ear to his own prayer not to treasure the fault up against "poor Joe," but to take it out on himself. Which is done, accordingly. We find no error injurious to the defendant at this point.

We dismiss the like charge of misconduct of a juror with the same conclusion, without particular discussion or observation—chiefly for want of time. The imputed remark of the juror—if he made it—was highly improper and not at all creditable to him as a man and a brother under oath to be impartial and of open mind. But he was only one-twelfth of the panel, and we will not think that his indiscreet and lawless talk—still, if he did indulge in it—infected the other eleven good men and true; a vulgar fraction is not to be esteemed the equal of eleven integers.

Dealing with the alleged errors in the instructions given by the trial court in charge to the jury, we can not say—the whole charge and the whole case considered—that there was anything said or omitted that can fairly be found prejudicial to the substantial rights of the defendant. So we find no error intervening in this respect.

We come now upon the last assignment of error with which we shall deal specifically, in this already too long discussion.

We have reached a conclusion in regard to it only after long and more than usual consideration and with all the reluctance that is proper when a compelling but difficult duty is to be performed. But we are none the less clear in our sense of that duty and the entire propriety of our discharge of its obligatory command, by law laid upon us.

The charged error is in the overruling by the court below of the motion for a new trial, because the verdict of the jury was excessive in amount. That amount was $25,950. We are quite aware that the judgment we are reviewing is for a much less amount. But at present we are called upon to deal alone with the verdict upon which the judgment rests. The sealed judgment of a court is of no value in determining the motives which influenced the jury in reaching the verdict as it was before the court reformed it. If the verdict, not as pruned by the court, but as returned by the jury, is in amount so large as by its appearance to justify the conclusion of being reached through passion or prejudice, the imperative duty of the trial court is to set it aside. No substitute for this command can be found by dicker or bargain—no matter between whom— but strict obedience is by statute enjoined. The law of Ohio upon this point is clear, as we think. It is lucidly stated in *Pendleton Street Railway* v. *Rahmann,* 22 O. S., 445. After allowing an exception in cases where the mistake in amount is apparent and the correction is a matter of arithmetic or computation only, which excludes the ingredient of perverseness—and which of course is not this case—the court goes on to say, p. 448:

''2. But in the class of actions in which the opinion of the jury, unaided by any known standard of valuation, determines the magnitude of the recovery, the power of the court over an excessive finding is, in some instances, controlled by statutory conditions. Although the verdict, if purged of any supposed excess, might, in the opinion of the court, be well sustained as to the residue by the facts disclosed, yet the presence and influence of passion or prejudice, in producing the excess, vitiates the verdict *in toto,* and excludes the power of the court to validate, or save, any part of it against the concurrence of either party. Without a consent of both, to a *remittitur* and judgment, the verdict, in such case, must be vacated.

''The terms of the statute are unambiguous and peremptory. For damages *materially* excessive, appearing to have been given under the influence of passion or prejudice, the verdict 'shall be vacated and a new trial granted.'

''This statute merely enacts the pre-existing rule of the common law. Its theory undoubtedly is that individual opinions,

which depend on, and vary with mental and moral constitution, are extremely eccentric and uncertain; that the money value of personal wrongs, which can have no certain standard of measurement, and hence must of necessity be determined by this, shall not, however, be committed to the arbitrament of a single mind, but shall be measured by the average of impartial opinion, of which the concurrence of twelve minds, uninfluenced by passion, resentment, or corruption, is supposed to be a fair expression. When, therefore, a verdict is attained by the presence of these statutory infirmities, the law will not, against the consent of either party, substitute the opinion of the court for that of the twelve triers provided by the Constitution. For if recklessness has controlled in measuring the extent, it is not improbable that it may have controlled in determining the right of recovery; which another panel, unbiased by improper influences, may greatly modify, or wholly reverse. *Lambert* v. *Craig*, 12 Pick., 199; *Long* v. *Hopkins*, 10 Geo., 37; *Howlet* v. *Cruchley*, 5 Taunt., 277. But the rule of common law was not inflexible, as many cases are reported in which the doctrine of *remittitur* was applied in actions of this class."

But before the trial court should have proceeded to grant a new trial on this ground, the verdict must have appeared, the connection with the circumstances of the case and all of them, so large that its rendition by the jury could be accounted for upon no rational footing except that it was induced by passion and prejudice; it must have been apparent, from its amount—still in its relation to the whole case—that it was so induced and brought about. Finding *that*, the correlative duty of the court to order a new trial would be clear and unquestionable; because in that case the verdict would not be the verdict to which the litigants were entitled—the verdict of an impartial jury—but the verdict of a perverse jury, and hence in law no verdict. In that view it could not be the basis of a lawful judgment.

So much premised as the law controlling, we come to a short consideration of the facts essential to a proper resolution of the question.

The mutilation of the plaintiff, through the found and adjudged fault of the defendant, consisted in the loss of his right hand—a serious loss in any view, and one for which no man

would, if it were left to him by choice, take as a substitute any number of dollars—perhaps not even $25,950. But that is not the question. The loss being a fact accomplished, the law commands a commutation of the loss to a money compensation, so far as money can be made to satisfy what the word compensation stands for. What may be sentiment but certainly is a momentous loss, is commuted to terms of money, as the best, or only substitute which in the nature of things the law can furnish, and which must be accepted as a forced *quid pro quo*—at all events and whether or no; the question has become pecuniary and the standard is single. The loss in this case, while great, left to the plaintiff all the advantages of the bodily members still remaining. The capabilities thus left are by no means inconsiderable in the case of a supple-limbed and nimble-witted boy of European extraction, as this boy certainly was, judging from the record. Some of these left-over advantages are physical, which we need not particularize; others are intellectual, and in this day and country of opportunity are open alike to all who will grasp and improve them. For example, a man has his right hand disabled while a brakeman; without that disability he may have been a brakeman still; with it and its compulsion to another line of endeavor, he obtains an education, as he may, here and now; he masters a profession, becomes a lawyer, for instance, and achieves a reputation and acquires a competence, all without the lost member, by pressing the other members into such bodily service as he may in his changed circumstances still need. We are by no means to be understood as saying that such possibilities are to be used as set-offs against the injurious results of an employer's blameworthy negligence, or that a damage verdict can be paid or reduced by any such considerations as these. Still, they are a part of the whole case upon which this question is to be decided, and in that view we must have a proper regard to them.

Consider for a moment the pecuniary possibilities wrapped up in this $25,950 verdict. At six per cent., the yearly interest upon it is $1,557, or in the close neighborhood of $130 a month. At five per cent., it amounts to more than $100 a month. This is

in effect a pension at that rate, for the lifetime of the pensioner, with the advantage over the strict pension that at death the principal sum is passed on, intact, in the line of succession to the pensioner's heirs. Now let us make a single comparison. "Any person who was wounded in battle or in the line of duty in the Civil War, and is now unfit for manual labor by reason thereof, or who from disease or other causes incurred in line of duty resulting in his disability, is now unable to perform manual labor, is entitled to $30 per month," from the United States. No man who served in the Civil War can be less than about seventy years of age, so that none of the advantages inhering in youth are open to him; he is wholly dependent on the bounty of his generous government, which at the utmost is less than a third of what this verdict will bring at five per cent. And it is the highest pension allowed for disability by United States general laws, whatever the rank of the pensioner was in the military service of his country. As to pensions for disability incurred later than the Civil War, the rating is $8 a month for a private soldier; $20 for a captain; $25 for a major, and $30 for all grades from a lieutenant-colonel up to and including a major-general.

We make no present comment on this comparison. We state the facts.

We have not overlooked the testimony of one Dr. Burke, which is to the effect that the pain incident to an amputation may linger. But in the case of a growing boy who has a clean cut-off of the right hand, those of us whose recollection reaches back to the Civil War may be allowed to replace this opinion evidence with common knowledge. We attach little importance to it.

Upon as careful a consideration of this matter as we can give it, and with unfeigned reluctance, we have reached the conclusion in this case, in all its relations and under the sum total of its circumstances, that the verdict of the jury on its face and from its amount shows that it can be attributed only to a perverseness springing from passion or prejudice. To state it, without more, and in its relation to the facts proved, is to give it the appearance of having been returned under that influence. Placed alongside

the boy himself, his age, his reasonable prospects in life, his earning capacity both before and after his injury, and by itself it shocks all sense of proportion and stands out a clear anomaly, and this appears not from a dissection of the record, but from a birdseye glance at the whole. In our estimation it would not be difficult for one to go over the whole record before us and pick out the particular things, as well as the general policy of the trial, from which this motive was, step by step and by almost imperceptible degrees, evolved, built up, and moulded into a workable result, taking its final shape in the verdict justly obnoxious, as we think, to the objection now lodged against it. But we are not doing this and we are very far from weighing the evidence, ounce by ounce, or scruple by scruple, to warrant our opinion.

The inquiry next to be made is what was the duty of the trial court, if to his apprehension the verdict was returned under the improper influence denounced by our statute as an integral ground for a new trial? Our Supreme Court have answered it, not only in *Pendleton Street Ry. Co.* v. *Rahmann, supra,* but in the much later case of *Toledo Railways & Light Co.* v. *Paulin,* 93 O. S., 396. The court there say:

. "If the verdict is excessive, appearing to have been induced by passion or prejudice, it is the duty of the reviewing court to reverse and remand for a new trial."

Of course it would not be the duty of the reviewing court to do that, unless the lower court had come short of doing its duty.

But the judgment entered on the verdict differs from the verdict in amount—materially differs. It is less by just $10,000. Why it should be less by exactly that round figure, does not appear. That the plaintiff, "Poor Joe," with a twenty-five thousand and odd dollars verdict safely in his pocket, or that of his attorney, should donate to a soulless corporation a lump ten thousand of his ascertained right, unless under stress or compulsion, is a most unlikely thing, quite out of his class, as appears to us.

Still, the record is discreetly silent as to this sacrifice to one

who just then was very far from a god to be propitiated by the gifts of the poor. It says:

"Whereupon this cause came on to be heard upon the motion by the defendant for a new trial of this case; and the plaintiff having remitted the sum of $10,000 from the verdict of the jury, the said motion for a new trial is overruled."

The only inferable reason vouchsafed for the overruling of the motion, or that we can discover from the recitation of the entry, is the remission of $10,000. But for *that,* it is to be concluded, the new trial would have been allowed. As the plaintiff, for aught that appears, voluntarily gave up a part of his good luck to help on its shining way the corporation of which his counsel had spoken at the trial in highly disrespectful terms and as not being a proper object of charity at Polish hands—this being so, we say, of course *he* is in no shape to complain or to treat his liberal donation to the flood, or war-sufferer as an Indian's gift, and he should be held to whatever arrangement was made, if indeed the gift was an arranged matter and not the offspring of mere intuition of altruism on the part of the victor, to whom it seems did not belong the spoils, or not all of them, in his own estimation.

But the record shows that this obdurate and unfeeling donee was unreasonable enough to except to the judgment, although $10,000 to the good by reason of it. Judge West, who spoke for the Supreme Court in *Pendleton Street Ry. Co.* v. *Rahmann, supra,* said that if passion or prejudice intervenes and dictates the excess found by the jury, that fact alone "vitiates the verdict *in toto,* and excludes the power of the court to validate, or save, *any part* of it against the concurrence of *either party. Without the consent of both,* to a *remittitur* and judgment, the verdict, in such case, *must be vacated.*"

As we have observed, the denial of the motion for a new trial could have proceeded upon no other perceivable ground than that the verdict was larger than it ought to have been, and plainly the mistake was not one to be corrected by a mathematical calculation upon facts undisputed.

It looks, therefore, as if here there was a violation of the cardinal canon of construction of the statute adopted by the Supreme Court.

But it may be said that the defendant is in no situation to reject this bonus of the "gift-bearing Greeks," or Polacks, or whatever, and that it should not be heard to object to being done good to. The argument is not good in point of Ohio law, as has just been shown. And we think it equally unsound when measured by the yardstick of reason and principle. A renunciation of ten thousand dollars, from twenty-five thousand and up, of course is no substitute for an absolute right to a new trial, to which our Supreme Court, in the case cited, seems to say the defendant was entitled. And, if it were not so entitled, even so the remission might still be no adequate substitute. *Non constat* a new trial might have exonerated the defendant from liability altogether; any liability was denied and vigorously contested throughout the trial.

But we may be admonished that if upon the whole case we think substantial justice has been done by the judgment under review, it must not be disturbed. The law is so, but when a litigant is denied a substantial right, substantial justice has not been done—not to *him*. Substantial justice gives to a litigant a trial by an impartial jury. This the defendant has not had.

The right of the defendant—a right arising before the verdict had been taken liberties with, and existing quite apart from the judgment finally entered by remission of a part of the verdict's sins—its right at that point, we say and have found, was the right to a new trial, a right not to be impaired by a composition not consented to by the defendant and made over its saved and recorded exception.

The Supreme Court of Wisconsin, in *Heimlich* v. *Tabor*, 123 Wis., 565, vigorously combats the huckstering idea at the bottom of so many unauthorized and essentially lawless remittitur judgments. It says, p. 569:

"Now, it would seem to be quite clear that if a trial or appellate court compels a defendant to submit, at the plaintiff's option, to a judgment for less than that named in a verdict, held to

be fatally excessive, thus enabling the plaintiff to succeed without a new trial, and fails to guard against all reasonable danger of impairment of the former's right, as, for example, if it does so on the basis of allowing a *liberal,* or full, or, from the judge's standpoint, merely a fair compensation to the plaintiff, it invades the rights of the defendant. It does just what all courts have declared can not be legitimately done.

"Further, to allow a verdict which is fatally excessive to stand upon condition of plaintiff remitting the excess, or as it is sometimes said as indicated, consents to a reduction thereof to *the proper amount,* is likewise an invasion of such right, unless the *amount of the excess, or the proper amount* of the verdict is determined upon some basis which fairly takes the judgment of a jury for the guide instead of the independent judgment of the court. It is not logical to so vigorously defend the right of jury trial in civil actions by mere words and accompany it by substituting therefor, in fact, the judgment of the court. The right of jury trial is as sacred to the defendant as to the plaintiff."

We commend the last sentence of this quotation to the respectful and thoughtful consideration of both bench and bar and all concerned in the orderly administration of justice.

The Wisconsin court allows the remittitur process operation in those jurisdictions where a discretionary power is lodged in the judiciary. Even this conclusion was limited to cases where the plaintiff's right to recover is unquestioned.

But we conceive the law in Ohio to be settled differently and to confer on a defendant a clear right to a new trial when the verdict is found to be excessive from the perverse motives of passion or prejudice. *Pendleton Street Ry. Co.* v. *Rahmann, supra.*

In reaching this conclusion—rather laboriously, it is true—we have been at pains already to preserve our lines of communication, but not of retreat. We are not to permit any misunderstanding as to the path we have trod on the way to it. The way is clear enough, but it does not lie along the route of weighing the evidence in the case. We are expressly forbidden to do that. In *Toledo Railways & Light Company* v. *Paulin, supra,* the Supreme Court says:

"If the court of appeals from an examination of the printed record may weigh the evidence, which involves also the determination of the credibility of the various witnesses, and therefrom may reach a conclusion as to the nature and extent of the injuries suffered by plaintiff and fix the amount of money which, in its opinion, will reasonably compensate him for his loss, the court will have usurped the function of the jury. Time and money will have been uselessly expended in trying the case to a jury if these controlling questions of fact are not to be settled there but are to be considered and determined by the reviewing court."

Nevertheless, the court says, the finding being reached, as we have once quoted but for emphasis now repeat:

"If the verdict is found to be excessive, appearing to have been induced by passion or prejudice, it is the duty of the reviewing court to reverse and remand for a new trial."

From that duty, disagreeable or responsible as it may sometimes be, we must not, and do not, shrink. It should be clearly understood that while we are here, in a proper case there will be no hesitation in discharging it, even to overturning an unwarranted work of a jury, much as we respect in its place and to the measure of its true function, that valuable institution.

And we have no inclination to weigh evidence to reach such a conclusion. Speaking for myself alone, I say that if the time ever comes when I am compelled to sift a few grains from a slippery mass of chaff and sort out minute facts from an irrelevant volume, and balance down to the last poor scruple disputed particles of testimony, to no other or higher end than to enable me to fix a tariff on maimed human frames, or a price current for mutilated hands and feet—when, I say, *that* becomes any duty of mine—which Heaven forbid!—I will doff my badge of servitude and honor and respect the bench by leaving it; the process would imbrute a judge and dehumanize a man.

We say this, let it once more be remembered, lest hereafter, litigants, mistaking altogether our process in coming to the conclusion we have reached, shall ask us to weigh the evidence in a record to find in it a verdict inspired by the unworthy motives

of passion and prejudice, culminating in perverseness which in a proper case it is the duty of courts to correct. We disclaim the right or duty to do this. What we mean to say, and all that we mean to say, is that in this case, considered in its totality and under all its circumstances, bulked and in mass, the verdict can be accounted for rationally only as having been returned under the obnoxious motives mentioned, however mistakenly these may have been entertained by the jury, or however or by what persuasion they may have been induced in the jury's minds. It is not the mere amount of the verdict that makes us overturn it; we have upheld larger ones in proper cases. In *Moore* v. *Wallis* [18 N.P.(N.S.), 473], the judgment sustained was for $40,000; but the earning capacity of Wallis was shown to have been $15,000 yearly, and he was left a helpless and stranded wreck, physically and mentally, to drag out a miserable existence of constant pain. Viewing this case with the forward look and assuming for the advantage of the plaintiff all that the future is likely to hold in its hands for him, we can justify the verdict upon no rational theory of compensation.

For this error, and finding no other, the judgment complained of is reversed and the case is remanded to the court of common pleas for such further proceedings there as may be in accordance with law.

MEALS, J., and CARPENTER, J., concur.